**No. 25-60127**

# In the United States Court of Appeals for the Fifth Circuit

ARKANSAS PUBLIC SERVICE COMMISSION; MISSISSIPPI PUBLIC SERVICE COMMISSION,

PETITIONERS

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

RESPONDENT

consolidated with

**No. 25-60208**

CLEAN GRID ALLIANCE; ADVANCED POWER ALLIANCE; ADVANCED ENERGY UNITED; AMERICAN CLEAN POWER ASSOCIATION; SOLAR ENERGY INDUSTRIES ASSOCIATION,

PETITIONERS

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

RESPONDENT

*ON PETITION FOR REVIEW OF A*
*FINAL RULE OF THE FEDERAL ENERGY REGULATORY COMMISSION*,
*AGENCY NO. P204800, RIN 3084-AB72*

**PETITIONERS CLEAN GRID ALLIANCE, ADVANCED POWER ALLIANCE, ADVANCED ENERGY UNITED, AMERICAN CLEAN POWER ASSOCIATION, AND SOLAR ENERGY INDUSTRIES ASSOCIATION'S OPENING BRIEF**

[Counsel Listed On Next Page]

MELISSA ALFANO
*Senior Director of Energy Markets and Counsel*
*Solar Energy Industries Association*
*1425 K Street, N.W.*
*Ste. 1000*
*Washington, DC 20005*
*(202) 566-2873*
*malfano@seia.org*

*Counsel for Solar Energy Industries Association*

GABRIEL TABAK
*Assistant General Counsel*
*American Clean Power Association*
*1299 Pennsylvania Ave, N.W.*
*13th Floor*
*Washington, D.C. 20005*
*(202) 383-2500*
*gtabak@cleanpower.org*

*Counsel for American Clean Power Association*

NICHOLAS M. GLADD
*Counsel of Record*
KELSEY C. CATINA
STEVEN G. BOUGHTON
*Wilson Sonsini Goodrich & Rosati, P.C.*
*1700 K Street, N.W.*
*Washington, DC 20006*
*(202) 973-8000*
*ngladd@wsgr.com*

*Counsel for Petitioners Advanced Energy United, Advanced Power Alliance, American Clean Power Association, Clean Grid Alliance, and Solar Energy Industries Association*

**CERTIFICATE OF INTERESTED PERSONS**

No. 25-60127, *Ark. Pub. Serv. Comm'n v. FERC*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Under Fed. R. App. P. 26.1, Advanced Energy United ("AEU") states that it is a non-profit 501(c)(6) organization incorporated in the District of Columbia. No entity has any ownership interest in AEU. AEU does not have any outstanding shares or debt securities in the hands of the public nor any parent, subsidiary, or affiliates that have issued shares or debt securities to the public.

Advanced Power Alliance ("APA") is a non-profit 501(c)(6) organization incorporated under the laws of the State of Texas. No entity holds any ownership interest in APA. APA does not have any outstanding shares or debt securities in the hands of the public nor any parent, subsidiary, or affiliates that have issued shares or debt securities to the public.

The American Clean Power Association ("ACP") is a non-profit 501(c)(6) organization incorporated under the laws of the District of Columbia. No entity has any ownership interest in ACP. ACP does not have any outstanding shares or debt

securities in the hands of the public nor any parent, subsidiary, or affiliates that have issued shares or debt securities to the public.

Clean Grid Alliance ("CGA") is a non-profit 501(c)(3) organization incorporated under the laws of the State of Minnesota. As such, no entity holds any ownership interest in it. CGA does not have any outstanding shares or debt securities in the hands of the public nor any parent, subsidiary, or affiliates that have issued shares or debt securities to the public.

The Solar Energy Industries Association ("SEIA") is a tax-exempt trade association pursuant to 26 U.S.C. § 501(c)(6). SEIA has no parent corporation and no publicly held company owns 10% or more of its stock.

1. AEU is Petitioner.

2. APA is Petitioner.

3. ACPA is Petitioner.

4. CGA is Petitioner.

5. SEIA is Petitioner.

6. Wilson Sonsini Goodrich & Rosati, P.C. is Counsel for AEU, APA, ACPA, CGA, and SEIA.

7. Nicholas M. Gladd is Counsel for AEU, APA, ACPA, CGA, and SEIA.

8. Kelsey C. Catina is Counsel for AEU, APA, ACPA, CGA, and SEIA.

9. Steven G. Boughton is Counsel for AEU, APA, ACPA, CGA, and SEIA.

10. Gabriel Tabak is Counsel for ACPA.

11. Melissa Alfano is Counsel for SEIA.

12. Arkansas Public Service Commission is Petitioner.

13. Bridgette M. Frazier is Counsel for Arkansas Public Service Commission.

14. Mississippi Public Service Commission is Petitioner.

15. Michael Best & Friedrich, L.L.P. is Counsel for Mississippi Public Service Commission.

16. William D. Booth is Counsel for Mississippi Public Service Commission.

17. Alexander L. Peterson is Counsel for Mississippi Public Service Commission.

18. The Federal Energy Regulatory Commission ("FERC") is a federal agency and Respondent.

19. Robert Michael Kennedy, Jr. is Counsel for FERC.

20. Robert Harris Solomon is Counsel for FERC.

21. U.S. DOJ, Office of Immigration Litigation is Counsel for FERC.

22. Southwest Power Pool, Inc. is Intervenor in support of FERC.

23. Wright & Talisman, P.C. is Counsel for Southwest Power Pool, Inc.

24. Matthew Joseph Binette is Counsel for Southwest Power Pool, Inc.

25. Vivian Chum is Counsel for Southwest Power Pool, Inc.

26. MISO Transmission Owners are Intervenors in support of FERC.

27. Wright & Talisman, P.C. is Counsel for MISO Transmission Owners.

28. Wendy N. Reed is Counsel for MISO Transmission Owners.

29. Midcontinent Independent System Operator, Inc. is Intervenor in support of FERC.

30. Christopher Davies Supino is Counsel for Midcontinent Independent System Operator, Inc.

In addition to Petitioners, Respondent, Intervenors, and their counsel, the following non-governmental individuals and entities participated in the proceedings below at FERC and may have a financial interest in the outcome of this litigation.

| **Entity** | **Connection and Interest** |
|---|---|
| Alliant Energy Corporate Services, Inc. | Intervenor at FERC |
| Ameren Services Company | Intervenor at FERC |
| American Council on Renewable Energy | Intervenor at FERC |
| American Electric Power Service Corporation | Intervenor at FERC |
| Americans for a Clean Energy Grid | Intervenor at FERC |
| Arevon Energy, Inc. | Intervenor at FERC |
| Association of Businesses Advocating Tariff Equity | Intervenor at FERC |
| Clark Hill PLC | Counsel for Association of Businesses Advocating Tariff Equity |
| Basin Electric Power Cooperative | Intervenor at FERC |
| Thompson Coburn LLP | Counsel for Basin Electric Power Cooperative |
| Clean Wisconsin | Intervenor at FERC |
| Coalition of MISO Transmission Customers | Intervenor at FERC |
| McNees Wallace & Nurick LLC | Counsel for Coalition of MISO Transmission Customers |
| Consumers Energy Company | Intervenor at FERC |
| Cooperative Energy | Intervenor at FERC |
| Thompson Coburn LLP | Counsel for Cooperative Energy |
| EDF Renewables, Inc. | Intervenor at FERC |
| Hush Blackwell, LLP | Counsel for EDF Renewables, Inc. |
| EDP Renewables North America LLP | Intervenor at FERC |
| Entergy Arkansas, LLC | Intervenor at FERC |

| | |
|---|---|
| Entergy Louisiana, LLC | Intervenor at FERC |
| Entergy Mississippi, LLC | Intervenor at FERC |
| Entergy New Orleans, LLC | Intervenor at FERC |
| Entergy Texas, LLC | Intervenor at FERC |
| Entergy Services, LLC | Intervenor at FERC |
| Environmental Law & Policy Center | Intervenor at FERC |
| Evergy Kansas Central, Inc.; Evergy Metro Inc.; and Evergy Missouri West, Inc. | Intervenor at FERC |
| Fresh Energy | Intervenor at FERC |
| Illinois Industrial Energy Consumer | Intervenor at FERC |
| Invenergy Solar Development North America LLC | Intervenor at FERC |
| Sheppard Mullin Richter & Hampton LLP | Counsel for Invenergy Solar Development North America LLC |
| Invenergy Thermal Development LLC | Intervenor at FERC |
| Sheppard Mullin Richter & Hampton LLP | Counsel for Invenergy Thermal Development LLC |
| Invenergy Transmission LLC | Intervenor at FERC |
| Sheppard Mullin Richter & Hampton LLP | Counsel for Invenergy Transmission LLC |
| Invenergy Wind Development North America LLC | Intervenor at FERC |
| Sheppard Mullin Richter & Hampton LLP | Counsel for Invenergy Wind Development North America LLC |
| Louisiana Energy Users Group | Intervenor at FERC |
| Kean Miller Hawthorne D'Armon McCowan & Jarman LLP | Counsel for Louisiana Energy Users Group |
| LSP Transmission Holdings II, LLC | Intervenor at FERC |
| Engleman Fallon, PLLC | Counsel for LSP Transmission Holdings II, LLC |
| Midcontinent Independent System Operator, Inc. | Intervenor at FERC |
| Duane Morris LLP | Counsel for Midcontinent Independent System Operator, Inc. |
| MISO Transmission Owners | Intervenor at FERC |

| | |
|---|---|
| Wright & Talisman, P.C. | Counsel for MISO Transmission Owners |
| Natural Resources Defense Council | Intervenor at FERC |
| NextEra Energy Resources, LLC | Intervenor at FERC |
| NIPSCO Large Customer Group | Intervenor at FERC |
| Lewis & Kappes, P.C. | Counsel for NIPSCO Large Customer Group |
| Organization of MISO States, Inc. | Intervenor at FERC |
| Orsted Wind Power North America LLC | Intervenor at FERC |
| Otter Tail Power Company | Intervenor at FERC |
| Pine Gate Renewables, LLC | Intervenor at FERC |
| Renew Missouri Advocates | Intervenor at FERC |
| Savion, LLC | Intervenor at FERC |
| Eversheds Sutherland (US) LLP | Counsel for Savion, LLC |
| Shell Energy North America (U.S.), L.P. | Intervenor at FERC |
| Eversheds Sutherland (US) LLP | Counsel for Shell Energy North America (U.S.) |
| Shell New Energies US, LLC | Intervenor at FERC |
| Eversheds Sutherland (US) LLP | Counsel for Shell New Energies US, LLC |
| Sierra Club | Intervenor at FERC |
| Southwest Power Pool, Inc. | Intervenor at FERC |
| Wright & Talisman, PC | Counsel for Southwest Power Pool, Inc. |
| Spearmint Renewable Development Company, LLC | Intervenor at FERC |
| Paul Hastings LLP | Counsel for Spearmint Renewable Development Company, LLC |
| Sunflower Electric Power Corporation | Intervenor at FERC |
| Thompson Coburn LLP | Counsel for Sunflower Electric Power Corporation |
| Sustainable FERC Project | Intervenor at FERC |
| Texas Industrial Energy Consumers | Intervenor at FERC |
| O'Melveny & Myers LLP | Counsel for Texas Industrial Energy Consumers |

| | |
|---|---|
| Union of Concerned Scientists | Intervenor at FERC |
| Upper Michigan Energy Resources Corporation | Intervenor at FERC |
| Western Area Power Administration | Intervenor at FERC |
| WIRES | Intervenor at FERC |
| Wisconsin Electric Power Company | Intervenor at FERC |
| International Transmission Company, et al. | Intervenor at FERC |
| Oklahoma Gas and Electric Company | Intervenor at FERC |
| Omaha Public Power District | Intervenor at FERC |
| Public Citizen, Inc. | Intervenor at FERC |
| Western Farmers Electric Cooperative | Intervenor at FERC |
| Eversheds Sutherland (US) LLP | Counsel for Western Farmers Electric Cooperative |
| Nebraska Public Power District | Intervenor at FERC |
| Stinson LLP | Counsel for Nebraska Public Power District |

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI

/s/ *Nicholas M. Gladd*
Nicholas M. Gladd
*Counsel for* Petitioners

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would assist this Court. This case presents several important issues bearing on FERC's ability to accept a certain rate design and cost allocation proposal, specifically whether FERC complied with the "cost-causation" principle and the "beneficiary-pays" principle. It also raises an important Administrative Procedure Act challenge designed to ensure FERC is not overstepping its regulatory authority.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i
TABLE OF AUTHORITIES ............................................................................ x
INTRODUCTION ............................................................................................ 1
JURISDICTIONAL STATEMENT .................................................................. 4
STANDING ....................................................................................................... 4
STATEMENT OF THE ISSUES ...................................................................... 6
STATEMENT OF THE CASE .......................................................................... 7
I. Regulatory Background ............................................................................ 7
II. The Joint Targeted Interconnection Queue Proposal .................................. 13
III. JTIQ Portfolio #1 ....................................................................................... 16
IV. FERC's Orders and Findings ..................................................................... 18
SUMMARY OF ARGUMENT ......................................................................... 23
ARGUMENT .................................................................................................... 24
I. Standard of Review ..................................................................................... 24
II. The JTIQ Orders Violate the Beneficiary-Pays Principle ........................... 25
III. FERC Failed to Show Generators Are the Cause of the JTIQ Upgrades ........................................................................................................ 44
CONCLUSION ................................................................................................. 50
CERTIFICATE OF SERVICE
CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

*Am. Fed'n of Gov't Emps., Loc. 2924 v. Fed. Labor Rels. Auth.*,
470 F.3d 375 (D.C. Cir. 2006)....................25

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014)....................42

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................4

*Clinton v. City of N.Y.*,
524 U.S. 417 (1998)....................5

*El Paso Elec. Co. v. FERC*,
76 F.4th 352 (5th Cir. 2023)....................25, 26, 28, 42

*El Paso Elec. Co. v. FERC*,
832 F.3d 495 (5th Cir. 2016)....................27, 32

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)....................42, 43, 44

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016)....................25

*Ill. Pub. Telecomm. Ass'n v. FCC*,
117 F.3d 555 (D.C. Cir. 2018)....................25

*Illinois Com. Comm'n v. FERC*,
576 F.3d 470 (7th Cir. 2009)
....................13, 27, 28, 29, 32, 45

*KN Energy, Inc. v. FERC*,
968 F.2d 1295 (D.C. Cir. 1992)....................12, 36

*La. Pub. Serv. Comm'n v. FERC*,
184 F.3d 892 (D.C. Cir. 1999)....................42

*Long Island Power Auth. v. FERC*,
27 F.4th 705 (D.C. Cir. 2022)....................28

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................24

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................5

*Midcontinent Indep. Sys. Operator, Inc.*,
189 FERC ¶ 61,108 (2024)
........................................... 11, 14, 15, 16, 18, 19, 22, 31, 33, 39, 40, 43, 48

*Midcontinent Indep. Sys. Operator, Inc.*,
190 FERC ¶ 62,015 (2025).....................................................................19

*Midcontinent Indep. Sys. Operator, Inc.*,
191 FERC ¶ 61,231 (2025)
................................ 20, 21, 22, 26, 32, 33, 36, 37, 40, 41, 43, 44, 46, 48, 50

*Midwest Indep. Transmission Sys. Operator, Inc.*,
129 FERC ¶ 61,060 (2009)...............................................................11, 12

*Midwest ISO Transmission Owners v. FERC*,
373 F.3d 1315 (D.C. Cir. 2004)..........................................................29

*Midwest ISO Transmission Owners v. FERC*,
373 F.3d 1361 (D.C. Cir. 2004)..........................................................35

*MISO Transmission Owners v. FERC*,
819 F.3d 329 (7th Cir. 2016) ............................................................28

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...........................................................25, 41

*N.Y. v. FERC*,
535 U.S. 1 (2002)...............................................................................26

*Nat'l Religious Broads. v. FCC*,
138 F.4th 282 (5th Cir. 2025) ..........................................................4, 5

*Neb. Pub. Power Dist. v. FERC*,
957 F.3d 932 (8th Cir. 2020) .............................................................28

*Old Dominion Elec. Coop. v. FERC*,
898 F.3d 1254 (D.C. Cir. 2018)..................................................27, 28, 36

*Paragould Light & Water Comm'n v. FERC*,
144 F.4th 287 (D.C. Cir. 2025)...........................................................28

*Pioneer Trail Wind Farm, LLC v. FERC*,
798 F.3d 603 (7th Cir. 2015) .............................................................29

*S.C. Pub. Serv. Auth. v. FERC*,
762 F.3d 41 (D.C. Cir. 2014)........................................................26, 27, 29

*Sw. Elec. Power Co. v. EPA*,
920 F.3d 999 (5th Cir. 2019) .............................................................25

*Tex. Corn Producers v. U.S. EPA*,
141 F.4th 687 (5th Cir. 2025) ..........................................................5, 6

*Transcont'l Gas Pipe Line Corp.*,
112 FERC ¶ 61,170 (2005) .......... 29

*U.S. Chamber of Com. v. U.S. Dep't of Labor*,
885 F.3d 360 (5th Cir. 1997) .......... 25

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996) .......... 4

## STATUTES

5 U.S.C. § 706(2)(A) .......... 24, 33

16 U.S.C.
§ 824(b)(1) .......... 12
§824*d* .......... 26
§ 824*d*(a) .......... 12
§ 825*l* .......... 4
§ 825*l*(b) .......... 4

## OTHER

*Annual U.S. Transmission Investments 1996-2023*, Brattle Group, at 1 (2023), https://www.brattle.com/wp-content/uploads/2023/07/Annual-US-Transmission-Investments-1996%E2%80%932023.pdf .......... 35

*Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068 (2024), *order on reh'g*, Order No. 1920-A, 189 FERC ¶ 61,126 (2024) .......... 9

Fed. R. App. P. 15(a) .......... 4

FERC, *An Introductory Guide to Electricity Markets Regulated by the Federal Energy Regulatory Commission* (Apr. 3, 2025), https://www.ferc.gov/introductory-guide-electricity-markets-regulated-federal-energy-regulatory-commission .......... 8

FERC, *Energy Primer: A Handbook of Energy Market Basics* (Jan. 2024), https://www.ferc.gov/media/energy-primer-handbook-energy-market-basics .......... 7, 8

*Improvements to Generator Interconnection Proc. & Agreements*, Order No. 2023, 184 FERC ¶ 61,054, P 453 (2023), *order on reh'g and clarification*, Order No. 2023-A, 186 FERC ¶ 61,199 (2024) .......... 10

Maeve Allsup, *Scoop: These are the 321 awards DOE is canceling*, LATITUDE MEDIA (Oct. 2, 2025) https://www.latitudemedia.com/news/scoop-these-are-the-321-awards-doe-is-canceling/. .......... 18

MISO and SPP, *Joint Targeted Interconnection Queue Study: Executive Summary and Technical Report*, at 2 (2022), https://cdn.misoenergy.org/JTIQ%20Report623262.pdf ............................49

MISO, *JTIQ Status Update – Planning Advisory Committee* (2023), https://cdn.misoenergy.org/20231011%20PAC%20Item%2008 a%20JTIQ%20Status%20Update630459.pdf ..............................................37

Notice of Proposed Rulemaking, 179 FERC ¶ 61,028 (2022) ...............................10

Order No. 1000, *Transmission Plan. & Cost Allocation by Transmission Owning and Operating Pub. Util.*, 136 FERC ¶ 61,051 (2011)..........................................................................................9, 13, 27, 35

Order No. 1920. *Transmission Plan. & Cost Allocation by Transmission Owning and Operating Pub. Util.*, Order No. 1000, 130 FERC ¶ 61,066 (2010)..........................................9, 10, 13, 27, 29

Order No. 1920. *Transmission Plan. & Cost Allocation by Transmission Owning and Operating Pub. Util.*, *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132 (2012) ............................9, 29

Order No. 1920. *Transmission Plan. & Cost Allocation by Transmission Owning and Operating Pub. Util.*, *order on reh'g and clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012).......................................................................................................9

Press Release, *MISO, SPP, MISO and SPP to conduct joint study targeting interconnection challenges* (Sep. 14, 2020), https://web.archive.org/web/20250427105619/https://www.spp.org/news-list/miso-and-spp-to-conduct-joint-study-targeting-interconnection-challenges/ ........................................................................49

Press Release, U.S. Dep't of Energy, *Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion* (Oct. 2, 2025) https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion; ......................18

*Reg'l Transmission Org.*, Order No. 2000, 89 FERC ¶ 61,285 (1999), *order on reh'g*, Order No. 2000-A, 90 FERC ¶ 61,201 (2000) ................8, 13

SPP, *Benefit Metrics Manual*, § 6.2 (2025), https://www.spp.org/documents/74320/benefit%20metrics%20 manual%2020250715.pdf...................................................................33

*Standardization of Generator Interconnection Agreements & Proc.*, Order No. 2003, 104 FERC ¶ 61,103, P 220 (2003), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220 (2004), *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401 (2005)................................10

## INTRODUCTION

For all its complexities, the electricity sector is based on a simple economic relationship: consumers, from households to industrial operations, demand electricity, and generation—the supply—is built to serve that demand. The vast, interconnected network of wires known as the power grid delivers the electrons supplied to meet that demand. Until now, absent a bilateral agreement to the contrary, the costs of the power grid have been assigned to the demand side of the market, as the side that triggered the need for that delivery infrastructure, with an important exception: if a specific generation resource is found to require a particular upgrade to the transmission system, the costs of that upgrade will be assigned to that specific generation resource. That framework is based on the principles that costs should be allocated to the entity or entities that caused them, and the allocation should be commensurate with the benefits received.

In the orders under review, the Federal Energy Regulatory Commission ("FERC") has flipped that framework on its head by pre-allocating 100 percent of the costs of certain large transmission system infrastructure to future generation resources—including resources that have not yet even been proposed—without conducting a causation study, and despite acknowledging that consumers on the demand side both cause the need for, and benefit significantly from, the infrastructure at issue. FERC's order contravenes bedrock cost allocation principles and inverts the

industry's demand and supply relationship to adopt a novel allocation of transmission system costs.

Legal precedent spanning decades makes clear that the costs of new transmission facilities must be allocated to customers consistent with the "cost-causation" principle—*i.e.*, that a customer's cost allocation must reflect the costs actually caused by the customer—and the "beneficiary-pays" principle—i.e., that the costs borne by a customer should be roughly commensurate with benefits the customer receives. The orders under review defenestrate both of those principles, allocating solely to future generators—before they have even materialized—the full cost of major transmission infrastructure. FERC wrongly assumed that (1) consumers do not benefit from the transmission infrastructure at issue and (2) generators are the sole cause of those transmission costs. Moreover, FERC's decision applies those assumptions and impose the resulting cost allocation without ever conducting a fact-specific analysis of whether, or to what extent, a particular generation project or set of consumers cause or benefit from the transmission facilities at issue. In so doing, FERC failed to analyze the costs allocated to, and the benefits received by, customers and generators as required under the precedent of this and other courts. FERC allocated solely to future generators 100 percent of the costs of a portfolio of transmission upgrades estimated to cost $1.7 billion by assuming that those generators

are the sole cause of those upgrades and that any benefits to consumers are incidental. Each of those assumptions is a legal fiction, untethered from reality. The record does not identify any generators that caused the upgrades at issue—but it does indicate that consumers will likely receive over $1 billion in benefits.

Although it is possible that a particular generator can necessitate, benefit from, and therefore be allocated costs associated with a particular transmission system upgrade, controlling precedent requires such cost allocations to be consistent with both cost-causation and beneficiary-pays principles in order to satisfy the Federal Power Act ("FPA"). FERC has long complied with that precedent by allocating transmission system upgrade costs to generators only where a fact-specific engineering analysis demonstrates that a particular system upgrade is caused by a particular generator. In the orders under review, FERC has flipped that long-standing policy *sub silentio* and adopt rules that permit the costs of already-constructed transmission upgrades to be allocated solely to generators that come along in the future. Accordingly, FERC's decision violates both the FPA and the Administrative Procedure Act. The orders produce unjust, unreasonable, and unduly discriminatory rates; and are contrary to the record evidence, internally inconsistent with its own factual findings, and lack a rational explanation. The Court should vacate FERC's orders.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 16 U.S.C. § 825*l*. Petitioners challenge orders issued by FERC. Petitioners timely sought administrative rehearing of the challenged order as required by Section 313(a) of the Federal Power Act, 16 U.S.C. § 825*l*(a), and timely petitioned for review following issuance of FERC's orders, *see* 16 U.S.C. § 825*l*(b); Fed. R. App. P. 15(a); Dkt. 54[1]; Case 25-60208, Dkt. 1.

## STANDING

For "[a]ssociational standing"—which Petitioners assert—an association must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat'l Religious Broads. v. FCC*, 138 F.4th 282, 290 (5th Cir. 2025) (quoting *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996)). Petitioners meet that standard here.

For the first prong, Petitioners' members must show a "concrete, particularized, and actual or imminent" injury that is "fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (describing Article III standing requirements) (citation omitted). As described in the record before FERC, the challenged rule would result in "significant

[1] Unless otherwise indicated, "Dkt." cites refer to the lead docket, 25-60127.

cost increases" for Petitioners' members, specifically cost increases between 30% and 35% on a net present value basis and between 55% and 75% when taking into account the additional risk, uncertainty, and security requirements. *Midcontinent Indep. Sys. Operator, Inc. v. Sw. Power Pool, Inc.*, Protest of the Clean Energy Associations, Docket Nos. ER24-2797-000, *et al.*, 16, 23-24 (filed Sep. 19, 2024), R.117:24 ("CEA Protest").

"[A]n economic injury is the 'quintessential injury upon which to base standing.'" *Tex. Corn Producers v. U.S. EPA*, 141 F.4th 687, 696 (5th Cir. 2025) (citation omitted). And "[t]he Supreme Court routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions" as injuries establishing Article III standing. *Id.* (citing *Clinton v. City of N.Y.*, 524 U.S. 417, 433 (1998)). The required "[c]ausation and redressability 'flow naturally' from this injury" because Petitioners' members "will not face [this] injury if [this Court] vacate[s] the Order, as Petitioners request." *Nat'l Religious Broads.*, 138 F.4th at 290 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

Out of an abundance of caution, EDP Renewables ("EDPR")—a member of ACP, SEIA, CGA, and APA—has also submitted a declaration (Attachment A) emphasizing how the current JTIQ rules injure it. For example, EDPR explains that under the challenged order, it and other generators will have to bear the "full cost" of the JTIQ projects. Attachment A ¶10. In other words, they will have to "solely

bear the cost of high-voltage transmission that benefits everyone who uses the grid." *Id.* ¶11. The challenged orders create "unjustified cost exposure" and impose "unreasonable upgrade costs"; remand is needed to "provide certainty." *Id.* ¶¶11-12.

Petitioners "easily satisfy the second and third requirements. The mission of each group is to represent the economic and legal interests of their members. And participation of the individual members is unnecessary here because the [Administrative Procedure Act] claim does not require individualized proof and petitioners seek only declaratory and equitable relief," specifically, vacatur of the challenged rule. *Tex. Corn*, 141 F.4th at 695.

## STATEMENT OF THE ISSUES

1. Whether FERC violated the Federal Power Act by accepting a rate design and cost allocation proposal that is inconsistent with the beneficiary-pays principle, which requires that the costs allocated to a customer must be roughly commensurate to the benefits that customer receives.
2. Whether FERC violated the Federal Power Act by accepting a rate design and cost allocation proposal inconsistent with the cost-causation principle, which requires that a customer's rates reflect to some degree the costs actually caused by the customer.
3. Whether FERC failed to engage in reasoned decision-making, in violation of the Administrative Procedure Act, by misapplying Commission precedent,

failing to explain how the JTIQ framework's cost allocation proposal is consistent with Commission policy and precedent, failing to respond to arguments and evidence presented to the Commission, and accepting the cost allocation proposal without support of substantial evidence in the record demonstrating it is just, reasonable, and not unduly discriminatory or preferential.

## STATEMENT OF THE CASE

### I. Regulatory Background

#### A. Transmission of Electricity

Providing electricity to consumers "relies on a complex system of infrastructure that can be divided into two general categories: generation and delivery." FERC, *Energy Primer: A Handbook of Energy Market Basics*, at 44 (Jan. 2024), https://www.ferc.gov/media/energy-primer-handbook-energy-market-basics ("Energy Primer"). Delivery infrastructure is divided into transmission and distribution infrastructure. *Id.* Transmission facilities deliver electricity from generators to the distribution system, which then distributes that electricity to consumers. *Id.* This power grid "operates like an interconnected web, where, with a few exceptions, the flow of power is not specifically controlled by the operators on a line-by-line basis"; rather, "power flows from sources of generation to consumers across any number of lines simultaneously, following the path of least resistance." *Id.* at 52. When transmission capacity is constrained, a condition known as "congestion," it limits the

boundaries of the generation market a system operator may access to meet consumer demand and increases the price of electricity. *See* Energy Primer at 70.

### B. Planning and Paying for New Transmission Facilities

The vast and interconnected web of wires that transmits electricity among and throughout the regions of the United States is largely managed by Regional Transmission Organizations ("RTO") that have operational control over the transmission facilities owned by the RTO's transmission-owning utility members. *See Reg'l Transmission Org.*, Order No. 2000, 89 FERC ¶ 61,285 (1999), *order on reh'g*, Order No. 2000-A, 90 FERC ¶ 61,201 (2000); *see also An Introductory Guide to Electricity Markets Regulated by the Federal Energy Regulatory Commission,* FERC, at 3 (Apr. 3, 2025), https://www.ferc.gov/introductory-guide-electricity-markets-regulated-federal-energy-regulatory-commission ("Energy Markets Guide"). Each RTO operates the transmission facilities under its control as an integrated regional system to deliver electricity from generation suppliers to utilities for resale and distribution to end consumers. *See* Energy Markets Guide at 3-4. Each RTO also oversees the planning and development of the regional transmission system under its control. *See id*. The rates and practices of RTOs and their transmission-owning members are subject to FERC's jurisdiction over the transmission and wholesale sale of electricity in interstate commerce. *See id*.

In RTOs, including the Southwest Power Pool ("SPP") and Midcontinent Independent System Operator ("MISO"), new transmission facilities are generally developed in one of three ways.

First, the regional transmission planning process: RTOs conduct system-wide transmission planning in accordance with FERC's landmark transmission planning rules, adopted in and Order No. 1920. *Transmission Plan. & Cost Allocation by Transmission Owning and Operating Pub. Util.*, Order No. 1000, 130 FERC ¶ 61,066, at P 219, 586, 622 (2010), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g and clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012); *Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068 (2024), *order on reh'g*, Order No. 1920-A, 189 FERC ¶ 61,126 (2024). In accordance with Order No. 1000, the costs of these regional facilities are allocated among beneficiaries in a manner "at least roughly commensurate with estimated benefits." *E.g.*, Order No. 1000 P 10 In 2023, FERC reaffirmed the value of regional planning in Order No. 1920 by mandating long-term regional transmission planning and cost allocation. Order No. 1920 P 1198; Order No. 1920-A P 5.

Second, the local transmission planning process: transmission system upgrades that either do not qualify for, or are exempt from, the regional planning process—often referred to as "local projects"—are planned and developed by one or

more transmission owners in the RTO's region. *See* Order No. 1920 P 17. The costs of those facilities are passed through to the end-use customers (in industry parlance, "load") in that transmission owner(s) service territory, because such facilities are needed to serve those customers and have limited benefit for customers beyond that transmission owner's system. Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection, Notice of Proposed Rulemaking, 179 FERC ¶ 61,028 (2022) (*Christie, Comm'r, concurring at P 15*).

Third, the generator interconnection process: when a generator requests to interconnect with the transmission system, the RTO will study the impact of that interconnection and assign the generator the costs of any interconnection facilities and transmission system upgrades that are specifically needed to accommodate its interconnection. *Improvements to Generator Interconnection Proc. & Agreements*, Order No. 2023, 184 FERC ¶ 61,054, P 453 (2023), *order on reh'g and clarification*, Order No. 2023-A, 186 FERC ¶ 61,199 (2024); *Standardization of Generator Interconnection Agreements & Proc.*, Order No. 2003, 104 FERC ¶ 61,103, P 220 (2003), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220 (2004), *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401 (2005). These interconnection-related facility costs generally are not allocated to end customers as is done for the cost of facilities developed through the

regional and local transmission planning processes. *See, e.g.*, MISO, FERC Electric Tariff, attach. X, app. 6 (109.0.0), § 11.4 (permitting reimbursement for transmission Network Upgrades only for certain facilities selected in MISO Transmission Expansion Plan ("MTEP")). There is an exception to this in MISO, called the "90/10 rule," under which—for interconnection-related transmission facilities at or above 345 kilovolts—ninety percent of the costs are allocated to the interconnection customer(s) at issue and ten percent of the costs are passed through to end customers by the owner of the transmission facility, based upon a rough presumption that high-voltage lines provide at least some benefits to system users other than the generators themselves. *See Midcontinent Indep. Sys. Operator, Inc.*, 189 FERC ¶ 61,108, P 86 (2024), R.148:30 ("Initial Order").[2] When FERC approved the "90/10 rule" in MISO, it explained that FERC "has consistently found that cost allocation for generator interconnection-related network upgrades must strike an appropriate balance between the entity that "caused" the need for an upgrade (*i.e.*, by deciding to interconnect a new generator) and the larger set of entities that will actually benefit from that upgrade, *Midwest Indep. Transmission Sys. Operator, Inc.*, 129 FERC ¶ 61,060, P 54 (2009),

[2] The parties have agreed to cite FERC orders, including the challenged orders, as "Shortname P [Paragraph Number]." The parties have further agreed to cite all other original-record documents as "R.[Record Item Number in Respondents Certified Index]:[Page Number of the Document]." The parties have agreed to cite these documents by their overall PDF page number, even when the document has internal pagination.

and further articulated its belief that "cost allocation proposals for interconnection-related upgrades should pay attention to cost-causation principles and to identifying the full array of benefits to generators, load, and other entities in the region from enhanced transmission infrastructure," *Midwest Indep., Inc.*, 129 FERC ¶ 61,060 P 56.

**C. FERC's Authority Over Cost Allocation**

The Federal Power Act grants FERC jurisdiction over "the transmission of electric energy in interstate commerce and . . . the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). FERC's primary role under Part II of the Federal Power Act is to ensure "rates and charges . . . for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission . . . shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful." 16 U.S.C. § 824*d*(a).

"FERC and the courts have added flesh to these bare statutory bones, establishing what has become known in Commission parlance as the 'cost-causation' principle." *See KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992). Cost causation dictates that "all approved rates reflect to some degree the costs actually caused by the customer who must pay them." *Id.* Over the three decades hence, the power grid expanded, became more interconnected, and required increasing cooperation among transmission systems. In Order No. 2000, FERC encouraged the

formation and voluntary participation by transmission-owning utilities in RTOs. Order No. 2000 P 4 (1999). A decade later, FERC instituted regional transmission planning and cost allocation and the "beneficiar[y]-pays" principle. Order No. 1000, 136 FERC ¶ 61,051, at PP 1, 623 (2011). In parallel with the expanding transmission grid, FERC and the courts shaped and expanded cost causation to include the beneficiary-pays principle, which generally requires that costs are allocated among beneficiaries in a manner "at least roughly commensurate with the estimated benefits." Order No. 1000 at P 622; *see also Illinois Com. Comm'n v. FERC ("Illinois Commerce Commission")*, 576 F.3d 470, 477 (7th Cir. 2009). Last year, FERC upheld Order No. 1000's cost allocation principles in Order No. 1920. Order No. 1920 P 1469.

## II. The Joint Targeted Interconnection Queue Proposal

On August 16, 2024, MISO and SPP each submitted to FERC proposed revisions to their respective Open Access Transmission Tariffs and their Joint Operating Agreement to implement the JTIQ framework. The JTIQ framework was proposed to address the lack of transmission system capacity at the seam between MISO and SPP, and the significant cost of transmission infrastructure needed to expand transmission capacity along that seam. Although MISO and SPP asserted that the JTIQ framework was needed as a result of the high number of generator interconnection requests in the two regions, they crafted the JTIQ process to develop transmission

infrastructure that is "typically evaluated as potential regional transmission projects to satisfy regional transmission planning needs." *See Midcontinent Indep. Sys. Operator, Inc.*, Submission of Revisions to the MISO-SPP JOA to Implement JTIQ Framework, Docket No. ER24-2797-000, Test. of Aubrey Johnson, Ex. No. MISO-001, 29, R.1:93 ("Johnson Test.") (filed Aug. 16, 2024) ("MISO JTIQ Filing"). They also acknowledged that JTIQ transmission facilities would provide benefits, including reducing transmission congestion costs, to end customers similar to other regional transmission projects. *Midcontinent Indep. Sys. Operator, Inc.*, Submission of Revisions to the MISO-SPP JOA to Implement JTIQ Framework, Docket No. ER24-2798-000, Test. of David Kelley, Ex. No. SPP-0001, 43-44, R.2:132-33 ("Kelley Test.") (filed Aug. 16, 2024) ("SPP JTIQ Filing").

Under the JTIQ framework, MISO and SPP will identify, on a serial basis, portfolios of high voltage transmission facilities (each a "JTIQ Portfolio") and then allocate the costs of those facilities to future generator interconnection customers identified after the fact based on certain criteria. The process of identifying which generator interconnection customers will bear the costs of a JTIQ Portfolio project involves three steps.

First, MISO and SPP will identify a "JTIQ Screening Group," which will consist of interconnection requests with "an application deadline that is after the date on which the RTOs' respective boards of directors have approved a JTIQ Portfolio" and

for which MISO and SPP have "not commenced [interconnection studies] as of the date the JTIQ Portfolio is declared to be fully subscribed." Initial Order P 65, R.148:18-19. Second, MISO and SPP will identify a "JTIQ Participation Group" of those generation projects within the JTIQ Screening Group that have (1) a greater than five percent distribution factor (which is a measure of the change in power flow on a transmission facility) "on one or more facilities of the other RTOs' transmission system modeled with all transmission facilities rated 100 kV and above" and (2) a "greater than a 1.00 MW (positive) impact on at least one JTIQ Upgrade included in the JTIQ Portfolio." *Id.* P 67, R.148:20. Third, MISO and SPP will identify a "JTIQ Commitment Group" of those projects within the JTIQ Participation Group for which the interconnection customer executes an agreement obligating it "to pay and provide security for the JTIQ Upgrades." *Id.* P 70, R.148:21.

The costs of the JTIQ Portfolio will be allocated to all interconnection customers in the corresponding JTIQ Commitment Group if the JTIQ Portfolio is fully subscribed, meaning the JTIQ Commitment Group is large enough to cover the full cost of the JTIQ Portfolio. *Id.* P 74, R.148:23-24. To the extent the JTIQ Portfolio is undersubscribed, the costs will be "charge[d] to load [i.e., end customers] throughout the MISO and SPP regions." *Id*. This is referred to as "backstop funding." *See id.* P 74, R.148:23. It is possible for the backstop funding to result in either a "tem-

porary backstop" or a "permanent backstop." Initial Order P 75, R. 148:24. It will be temporary if the transmission facilities in a JTIQ Portfolio are constructed and placed into service before interconnection customers enter the JTIQ Commitment Group. *Id.* The backstop will be permanent if the JTIQ Portfolio is not fully subscribed. *Id.*

## III. JTIQ Portfolio #1

Prior to filing its JTIQ framework with FERC, MISO and SPP identified its first portfolio of JTIQ transmission facilities ("JTIQ Portfolio #1"). It consists of five 345 kilovolt transmission projects. *Id.* P 6, R.148:3. Initially, it consisted of seven transmission projects, but MISO and SPP moved two of them into their regional transmission plans instead, meaning the costs of those two projects would be allocated entirely to end customers. *Id.* The remaining five projects in JTIQ Portfolio #1 are estimated to cost $1.7 billion. *Id.* However, in October 2023, the Department of Energy selected the projects in JTIQ Portfolio #1 to receive $464.5 million in grants to "to help enable the construction of the JTIQ Upgrades in JTIQ Portfolio #1." *Id.* P 7, R.148:4. Thus, MISO and SPP explained to FERC that the capital costs associated with JTIQ Portfolio #1 would be reduced by the funding received through the Department of Energy grants. *Id.* P 74, R.148:23-24.

MISO and SPP relied on the existence of JTIQ Portfolio #1, including the receipt of $464.5 million in Department of Energy grants for the transmission facilities therein, to support its JTIQ proposal at FERC, by identifying JTIQ Portfolio #1 before submitting the JTIQ proposal to FERC and using JTIQ Portfolio #1 as evidence that both the allocation of the costs associated with that particular portfolio—and the proposed framework more broadly—is consistent with the FPA. When developing the proposal, MISO and SPP determined that the first portfolio of JTIQ projects would provide nearly a $1 billion in benefits to SPP and MISO, *see* CEA Reh'g Req. 19, R.153:19 (noting $247 million in benefits to SPP and $724 million in benefits to MISO as of March 2022), including $99.3 million in benefits to load, *See* CEA Protest 11, R.117:11, n.34 (citing Application of the DOE Funds for JTIQ, Cost Allocation Working Group, at 7, Nov. 9, 2023) https://www.spp.org/Documents/70478/CAWG%20Nov%209%202023%20Posted%20Materials%20v3.zip. Despite conducting that analysis, when they filed the JTIQ Proposal with FERC, MISO and SPP provided only a general, qualitative acknowledgement of the substantial benefits to load, without providing a quantitative analysis of those benefits. *See* SPP JTIQ Filing 37-46, R.2:37-46.

On September 30, 2025, the Department of Energy apparently cancelled the grants for the transmission projects in JTIQ Portfolio #1. *See* Press Release, U.S.

Dep't of Energy, *Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion* (Oct. 2, 2025) https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion; Maeve Allsup, *Scoop: These are the 321 awards DOE is canceling*, LATITUDE MEDIA (Oct. 2, 2025) https://www.latitudemedia.com/news/scoop-these-are-the-321-awards-doe-is-canceling/.

## IV. FERC's Orders and Findings

### A. Initial Order Approving the JTIQ Proposal and Cost Allocation

On November 13, 2024, FERC issued an order accepting the JTIQ proposal, including its allocation of costs, as just and reasonable. Initial Order P 1, R.148:1. FERC found that load will benefit both qualitatively and quantitatively from JTIQ Portfolio #1, including through "Adjusted Production Cost savings . . . increased transmission system robustness and more timely interconnection of new generation, which helps loads meet their capacity resource needs . . . increased wheeling revenues, increased resilience, and decreased market uplift." *Id.* P 201, R.148:94. Despite this finding, FERC found that "allocating 100% of the capital costs of JTIQ Portfolio #1 to interconnection customers is consistent with the cost causation principle and allocates costs in a manner that is at least roughly commensurate with estimated benefits[,]" *id.* P 198, R.148:92, because "interconnection customers are the primary beneficiaries of JTIQ Portfolio #1" though "load still receives some benefit and is .

. . allocated . . . potentially temporary, cost responsibility” Initial Order P 202, R.148:95.

**B. Rehearing Order Upholding the JTIQ Cost Allocation Framework**

On December 13, 2024, Petitioners timely sought rehearing of the Initial Order. *Midcontinent Indep. Sys. Operator, Inc.*, Request for Rehearing of Clean Energy Associations, Docket Nos. ER24-2797-001 *et al.*, 1-2 (filed Dec. 13, 2024), R.153:1-2 (“CEA Reh’g Req.”). Petitioners challenged FERC’s conclusion that unknown, and perhaps nonexistent, interconnection customers could be the legally-relevant cause of JTIQ transmission facilities in accordance with cost-causation principles; FERC’s determination that interconnection customers are the sole beneficiaries for cost allocation purposes despite finding load benefits in many ways; and FERC’s failure to explain how allocating JTIQ costs among generation interconnection customers on a per-MW basis is a proxy for ensuring those costs are roughly commensurate with the benefits the interconnection customer might receive. *See id.* 7-15, R.153.7-15.

On January 13, 2025, Petitioners’ rehearing request was deemed denied by operation of law. *See Midcontinent Indep. Sys. Operator, Inc.*, 190 FERC ¶ 62,015 (2025), R.156:1. On June 26, 2025, FERC issued its Rehearing Order addressing the merits of the arguments presented on rehearing. *See Midcontinent Indep. Sys. Operator, Inc.*, 191 FERC ¶ 61,231 (2025), R.166:1-2 (“Reh’g Order”).

The Rehearing Order upheld FERC's approval of the JTIQ as just and reasonable, explaining that its decision was appropriate based on "the unique set of facts and circumstances" of the framework, including the volume of interconnection requests, the lack of transmission capacity at the SPP-MISO seam, the significant incremental cost of constructing transmission upgrades under the "but for" cost allocation rules of the affected system study process, funding from the Department of Energy, and the "novel forward-looking, portfolio and subscription-based design of the JTIQ framework" that FERC claimed is supported by the record and "economic theory." *See id.* P 24, R.166:16 & n. 83; *see also id.* P 32, R.166:24 & n. 126. FERC explained that the beneficiary-pays principle is an extension of the cost-causation principle. *Id.* P 28, R.166:21. Moreover, FERC asserted that the JTIQ framework is designed to "address transmission limitations at the MISO-SPP seam that prevent the interconnection of large amounts of generation." *Id.* P 31, R.166:23.

With respect to the cause of costs associated with JTIQ Portfolio #1, FERC explained that "[t]he JTIQ Study that identified the JTIQ Upgrades for JTIQ Portfolio #1 thus established the 'expectation of contribution' (from the interconnection customers), which was further buttressed by expert testimony in the record stating that the JTIQ Upgrades will very likely be fully subscribed within a few study cycles[,]" and that "without the expectation of contribution from the interconnection customers, JTIQ Portfolio #1 would not exist." Reh'g Order P 31, R.166:23.

In response to arguments that FERC ignored the benefits that JTIQ transmission facilities have for end customers, FERC concluded that "JTIQ Upgrades 'do not provide sufficient benefits to load to cover the full costs of the projects' and therefore that they 'do not "qualify[] as regionally cost-shared projects and were not selected in the regional plan for purposes of cost allocation.'" *Id.* (quoting Johnson Test. 11, R.1:111). FERC also concluded that MISO's decision to transfer two JTIQ projects from JTIQ Portfolio #1 to MISO's regional planning process "supports the conclusion that none of the five projects remaining in the final JTIQ Portfolio #1 were shown to sufficiently benefit transmission customers in the MISO and SPP regions such that those projects qualified for regional cost allocation." *Id.*

Regarding the JTIQ framework's allocation of costs to JTIQ Commitment Group projects on a per-MW basis, FERC acknowledged that JTIQ is not like the traditional generator interconnection study process in that "individual interconnection customers will not be evaluated for the level of individualized impacts on constraints with and without JTIQ Upgrades" but concluded that it is reasonable and consistent with the beneficiary-pays principle to assess allocation for JTIQ costs to interconnection customers based on their MW capacity because the JTIQ upgrades will be included in the base models of interconnection studies. *See* Reh'g Order PP 37-38, R.166:30-31. FERC concluded that allocating costs to load only as a backstop is appropriate because the load forecasts used to determine how much capacity

is needed on JTIQ facilities are “not relevant” to how costs are allocated based on the amount of capacity that a future generator will request for interconnection service. *See id.* P 39, R.166:31-32.

Finally, in response to arguments that FERC misapplied the beneficiary-pays principle, FERC agreed that “JTIQ Upgrades are more extensive than typical network upgrades for an individual interconnection request or a cluster” but nonetheless concluded that allocating 100% of JTIQ costs to future interconnection customers was at least roughly commensurate with estimated benefits because interconnection customers “eventually included in JTIQ Commitment Groups will benefit” and that JTIQ Upgrades do not sufficiently benefit load because they do not qualify for selection in regional planning. *See id.* P 42, R.166:33-34 (quoting P 198, R.148:92) (quotations omitted). While FERC did not explain whether the failure to qualify in regional planning was a result of a lack of benefits to load or other factors, it concluded that lack of inclusion was indicative of a lack of sufficient benefits to load. *Id.* at P 43, 45, R.166:34-35, 37.

On March 13, 2025, Petitioners timely filed a petition for review of the Initial Order in the U.S. Court of Appeals for the Seventh Circuit, which was subsequently transferred by order filed in this Court on April 22, 2025. On August 22, 2025, Petitioners filed an amended petition for review in this Court, revised to include FERC’s Rehearing Order.

## SUMMARY OF ARGUMENT

The fundamental question in this case is who should contribute to the cost of high voltage transmission infrastructure along the border of MISO and SPP. Although the type of infrastructure at issue is typically paid for by the end customers who use the electricity delivered by that infrastructure, in the orders on review FERC found that 100% of the cost of such infrastructure should instead be paid for by the generation resources that materialize to serve those customers. FERC reached that conclusion by irrationally assuming that end customers—the *sine qua non* of both generation supply and the power grid needed to deliver that supply—neither cause nor benefit from the transmission facilities at issue, and the as-yet unidentified generation customers are the sole cause and beneficiaries of those facilities. FERC's orders violate the Federal Power Act by producing rates that are inconsistent with principles of cost causation and, therefore, are unjust, unreasonable, and unduly discriminatory.

The JTIQ framework that FERC accepted is inconsistent with the beneficiary-pays principle because it ignores the benefits that end customers receive from the transmission system, erroneously assumes that generation suppliers are the only beneficiaries of that system, and fails to ensure that the costs borne by end customers and generation suppliers, respectively, are roughly commensurate with the benefits

they receive. In addition to violating the beneficiary-pays principle, the JTIQ framework runs afoul of the cost-causation principle by concluding that hypothetical generation suppliers—rather than the end customers that use electricity—are the sole cause of the transmission facilities at issue, notwithstanding that such generation suppliers might never materialize and, if they do not, the costs of the transmission facilities will be charged to end customers. The result is a framework that necessarily produces unlawful rates for both generation suppliers and end customers. In reaching this outcome, FERC's orders also fail to engage in reasoned decision-making, in violation of the Administrative Procedure Act, by ignoring record evidence and arguments, departing from precedent, and failing to articulate a satisfactory explanation for its decisions. This Court should vacate the orders on review.

## ARGUMENT

### I. Standard of Review

Under the Administrative Procedure Act, this Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024). This Court reviews FERC's orders under the Administrative Procedure Act's "arbitrary and capricious standard." *See, e.g., El Paso Elec. Co. v. FERC*, 76 F.4th 352, 359 (5th Cir. 2023). For FERC's order to withstand review,

FERC must have "examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (citing *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). The Court can uphold FERC's action, if at all, only on the basis of evidence and rationale on which FERC relied. *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 49-50 (1983). The Court must set aside FERC's action if it "offered an explanation for its decision that runs counter to the evidence before the agency." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). "Illogic[al] and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *U.S. Chamber of Com. v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 1997); *accord Ill. Pub. Telecomm. Ass'n v. FCC*, 117 F.3d 555, 566 (D.C. Cir. 2018); *Am. Fed'n of Gov't Emps., Loc. 2924 v. Fed. Labor Rels. Auth.*, 470 F.3d 375, 380 (D.C. Cir. 2006).

## II. The JTIQ Orders Violate the Beneficiary-Pays Principle

In applying the beneficiary-pays principle to justify the cost allocation of JTIQ Portfolio #1, FERC was required to undertake a comparison of the costs and benefits for both end customers and interconnection customers and to explain how the costs allocated to each were at least roughly commensurate with the benefits they will receive. *See El Paso*, 76 F.4th at 359. Instead of undertaking that analysis, FERC

allocated all the costs to one class of customers—generation interconnection customers—despite recognizing that end customers (load) also benefit from the transmission facilities at issue. Reh'g Order PP 24-25, R.166:15-19. In so doing, FERC expressly accepted that the JTIQ framework would not allocate costs to customers in an amount roughly commensurate with the benefits received. *See generally id*. Accordingly, FERC's order imposes unjust, unreasonable, and unduly discriminatory rates in violation of the Federal Power Act. FERC's decision to accept the JTIQ framework also runs afoul of the Administrative Procedure Act because it is not supported by the record, is contrary to its own findings, is inconsistent with precedent, and lacks reasoned analysis.

### A. FERC Approved an Unlawful Cost Allocation for Broadly Beneficial High-Voltage Transmission by Assigning Final Costs Solely to New Generators

Section 205 of the Federal Power Act requires that rates, terms, and conditions of service for or in connection with the transmission of electric energy must be just, reasonable, and not unduly discriminatory or preferential. *See* 16 U.S.C. §824*d*; *see also N.Y. v. FERC*, 535 U.S. 1, 6-7 (2002). These rates, terms, and conditions of service extend to the assignment of costs for interstate electric transmission. *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 83-85 (D.C. Cir. 2014). Articulated by both FERC and the courts, the "beneficiary-pays" principle serves as a tool for allocating costs of transmission facilities within and among different classes of customers who

benefit from those facilities. Order No. 1920 P 126; *accord* Order No. 1000 PP 622, 639, Order No. 1000-A, Order No. 1000-B (requiring costs of regional transmission facilities to be allocated in a manner that is at least roughly commensurate with estimated benefits); *S.C. Pub. Serv. Auth.*, 762 F.3d 83-5.

Multiple circuits, including this one, have explained the meaning and application of the "beneficiary-pays" principle. In line with the statutory requirement that rates be just and reasonable, FERC is "not authorized to approve a pricing scheme that requires a group of utilities to pay for facilities from which its members derive no benefits, or benefits that are trivial in relation to the costs sought to be shifted to its customers." *Illinois Commerce Commission*, 576 F.3d at 476. Nor can FERC "single out a party for the full cost of a project, or even most of it, when the benefits of the project are diffuse." *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1255 (D.C. Cir. 2018) (citation omitted). This Court adopted the cost allocation standard of *Illinois Commerce Commission. See El Paso Elec. Co. v. FERC*, 832 F.3d 495, 505 (5th Cir. 2016) ("utilities and FERC should not approve rates for transmission or electric services that do not 'reflect to some degree the costs actually caused by' the person or entity paying them") (quoting *Illinois Commerce Commission*, 576 F.3d at 476). And, at the same time, it upheld the beneficiary-pays principle as requiring FERC to "roughly correlate costs to benefits" in its determination of just and

reasonable rates rather than allocating costs with "exacting precision." *El Paso,* 76 F.4th at 362, 370.

In practice, courts have allowed FERC latitude within this standard, so long as a cost allocation approach places "significant weight" on each of the beneficiaries. *See Long Island Power Auth. v. FERC*, 27 F.4th 705, 713-14 (D.C. Cir. 2022) (upholding a grid operator's selection of a 50:50 ratio between regional and local benefits in determining cost allocation where both sets of benefits were "substantial," and stating that "any debate over the choice between a 50:50 ratio and, say, a ratio of 60:40 one way or the other would "amount to a quibble about exacting precision," rather than "a wholesale departure from the cost-causation principle.") (quoting *Old Dominion,* 898 F.3d at 1261).

Still, the beneficiary-pays principle forbids FERC from forcing a few customers to bear the entire cost of facilities that broadly benefit many. *See Paragould Light & Water Comm'n v. FERC*, 144 F.4th 287, 292 (D.C. Cir. 2025) ("FERC may not force customers to pay for a facility if they do not receive *any* benefits from it. …Nor can FERC force a few customers to pay the entire cost of a facility that benefits many.") (cleaned up) (citing *Illinois Commerce Commission*, 576 F.3d at 476; *Old Dominion*, 898 F.3d at 1261); *accord Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 940-41 (8th Cir. 2020); *MISO Transmission Owners v. FERC*, 819 F.3d 329, 335-

36 (7th Cir. 2016); *Pioneer Trail Wind Farm, LLC v. FERC*, 798 F.3d 603, 608-09 (7th Cir. 2015).

While courts give FERC some latitude in apportioning costs, the cost allocation FERC approved for the JTIQ does not pass muster under those judicial standards. For instance, FERC is still obligated to "compar[e] the costs assessed against a party to the burdens imposed or benefits drawn by that party," *Illinois Commerce Commission*, 576 F.3d at 476 (citing *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1315, 1361 (D.C. Cir. 2004)). FERC conducted no such comparison here. Further, FERC can assign costs to customers "only to the extent that *they* benefit from those facilities and, even then, any share they pay must be roughly commensurate with the benefits they receive." Order No. 1920 P 280; Order No. 1920-A P 108 n.280; *accord S.C. Pub. Serv. Auth.*, 762 F.3d at 53. In this instance, FERC hasn't even identified the specific generators to which costs will be assigned, much less demonstrated that those generators will receive benefits commensurate with the costs they will bear. FERC cannot avoid this duty through presumption, *Illinois Commerce Commission*, 576 F.3d at 477, nor is a generalized claim of benefits enough. *Id*. at 476; *see also Transcont'l Gas Pipe Line Corp.*, 112 FERC ¶ 61,170, P 109 (2005). But that is exactly how FERC reached its result in this case: FERC presumed that hypothetical generators will generally benefit from and only be allocated costs commensurate with those benefits.

In short, FERC entirely ignored the benefits end customers will receive, assumed that “expected” generators are the sole beneficiaries of the transmission facilities at issue and failed to compare the costs and benefits for either class of customers. The orders under review are irreconcilable with all relevant precedent. Although courts have provided FERC some discretion in cost allocation matters, FERC has stretched that discretion well past the breaking point in this instance.

As Petitioners noted in their Protest and Rehearing Request, MISO and SPP *had* explicitly quantified potential benefits to load at earlier stages in the JTIQ development process. *See, e.g.*, CEA Protest 11, R.117:11 (noting $99.3 million in benefits to SPP with a 2.75:1 benefit:cost ratio as of late 2023); CEA Reh’g Req. 19, R.153:19 (noting $247 million in benefits to SPP and $724 million in benefits to MISO as of March 2022). MISO and SPP also implicitly confirmed the benefits to load when they initially proposed a default cost allocation for 345 kV transmission line upgrades that would split costs 90-10 between generators and load. *See* CEA Protest 10, R.117:10. Petitioners argued that the testimony of MISO’s Vice President of System Planning and Competitive Transmission recognized that projects of this size are “typically evaluated as potential regional transmission projects to satisfy regional transmission planning needs *See id.* (citing Johnson Test. 11, R.1:93). Similarly, SPP’s Vice President of Finance and Chief Financial Officer acknowledged the usual regional planning for projects like these and noted that “these projects do

provide some benefits to load" particularly from congestion relief. *See* CEA Protest 10, R.117:10 (citing Kelley Test., R. 2:128). Those statements were corroborated by the November 9, 2023, SPP Cost Allocation Working Group which noted there would be $99.30 million in benefit to load, with a benefit-cost ratio for load of 2.75 to 1. *Id.* 10-11, R.117:11 n.34 (citing Application of the DOE Funds for JTIQ, Cost Allocation Working Group, at 7, Nov. 9, 2023) https://www.spp.org/Documents/70478/CAWG%20Nov%209%202023%20Posted%20Materials%20v3.zip.

But by the time the JTIQ Proposal arrived at FERC, specific estimates had been replaced with generalized assertions. Even then, the JTIQ proposal acknowledged substantial (but unquantified) benefits to load. *See id.* (citing SPP JTIQ Filing 40, R.2:40, identifying six categories of benefits to load from the JTIQ). In other words, the record before FERC clearly demonstrated that all parties agreed that JTIQ transmission facilities would provide some benefit to load, and—at least at the outset—MISO and SPP considered the JTIQ transmission facilities as akin to regional transmission planning facilities, with significant *quantified* benefits to load.

FERC's orders acknowledged multiple benefits to load from the JTIQ Upgrades but did not attempt to quantify them. *See* Initial Order P 201, R.148:94 (noting "the record demonstrates that load in MISO and SPP will receive quantitative and qualitative benefits from the JTIQ Upgrades in JTIQ Portfolio #1, including Adjusted Production Cost savings . . . increased transmission system robustness and

more timely interconnection of new generation, which helps loads meet their capacity resource needs. . . increased wheeling revenues, increased resilience, and decreased market uplift.”).

In the Rehearing Order, FERC again acknowledged these benefits, but for the first time sought to recharacterize them as “minor and incidental,” Reh’g Order P 24, R.166:17, without attempting to quantify them, or even provide “the roughest of ballpark estimate[].” *Illinois Commerce Commission*, 576 F.3d at 476. FERC’s dearth of analysis cannot satisfy the “beneficiary pays” standard and violates the Administrative Procedure Act. *See El Paso*, 832 F.3d at 503; *infra* Section II.C. Furthermore, by accepting MISO and SPP’s proposal to require end customers to provide backstop funding for JTIQ Upgrades if no, or not enough, new generators commit to bearing those costs, FERC has effectively conceded that end customers must receive benefits—otherwise the backstop funding would produce another clear-cut violation of the beneficiary pays principle. In short, MISO, SPP, and FERC all acknowledged multiple benefits to load from JTIQ Upgrades but failed to estimate those benefits relative to the $1.7 billion of the JTIQ portfolio that was assigned solely to as-yet-unidentified new generators.

FERC did not attempt to estimate or value benefits based on the evidence and thus could not reasonably claim that costs and benefits were “roughly correlate[d].” *El Paso*, 832 F.3d at 505. Instead, FERC simply asserted that benefits to load were

"minor and incidental." Reh'g Order P 24, R.166:17. That conclusory assertion does pass muster under the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

FERC then noted that that the JTIQ Upgrades did not meet the benefit-to-cost threshold to qualify as regionally planned transmission. *See* Initial Order P 198, R.148:92-93; Reh'g Order P 42, R.166:33-34. Even if true, this fact does not (and cannot) answer the relevant inquiry. SPP and MISO's regional transmission planning processes only identify projects that meet specified criteria, including meeting or exceeding benefit-cost ratios. *See* MISO, FERC Electric Tariff, attach. FF (90.0.0), §§ II.B, C, X.D (providing that, *inter alia*, Market Efficiency Projects, Multi-Value Projects, and Interregional Transmission Projects must have a respective benefit-to-cost ratio of 1.25, 1.0, and 1.25 or greater to qualify); *see also* SPP, *Benefit Metrics Manual*, § 6.2 (2025), https://www.spp.org/documents/74320/benefit%20metrics%20manual%2020250715.pdf (assuming a minimum benefit-to-cost ratio of at least 1.0). But a project could fail to qualify for a regional transmission plan and *still provide significant benefit to load*, a fact these orders implicitly acknowledge. Further, if the same project was built within the footprint of a single transmission owner, the costs would be passed through to its load customers. However, when benefits to load are split between customers in two RTOs, as is the case with JTIQ Upgrades, it is much more challenging to meet the benefit to cost ratio in

a single RTO's regional planning criteria given not all the load beneficiaries are considered in a single study. FERC offers no explanation why it is just and reasonable to bifurcate benefits to load at the MISO-SPP seam but nowhere else.

Instead, FERC springboards to an erroneous conclusion: that non-selection of JTIQ Upgrades in a regional transmission plan is conclusive of their lack of sufficient benefit to load and, therefore, all costs should be allocated solely to new generators. This elevates form over function. In the JTIQ Orders under review, FERC presumes the absence of benefits to load based on a transmission project's rejection in a particular selection process that is not based solely on a benefits analysis nor considers the full universe of benefits between the RTOs—in other words, a process not based on *an actual analysis of the project's benefits*.

To take a more concrete example, under FERC's rationale, building a new road between two towns would only be considered to benefit the towns' residents if the project went through a regional planning process instead of a town's local process—regardless of how much the road would actually be used by the towns' residents. That rationale does not withstand the slightest scrutiny, but that is what FERC has done here. In fact, FERC's logic goes one step further: allowing the towns to allocate the costs of the road solely to suppliers that deliver goods to the towns' residents, on the theory that—*because* the road was not part of a regional planning process—only the suppliers benefit from the road, even if others will be able to drive

on it. Contrary to FERC's rationale, the benefits of infrastructure turn on how it is used in the real world, not which brand of red tape was used in planning it. Proposed transmission projects can and—in the case of JTIQ Portfolio #1—do have benefits to load even if they are not selected in the transmission planning process or were never presented or studied in that planning process at all.

By FERC's rationale, local transmission projects (which make up over half of all transmission expenditures and are cost-allocated to end customers) could be presumed not to provide sufficient benefits to allocate costs to load because they, too, are also identified outside regional planning processes. *See, e.g.*, *Annual U.S. Transmission Investments 1996-2023*, Brattle Group, at 1 (2023), https://www.brattle.com/wp-content/uploads/2023/07/Annual-US-Transmission-Investments-1996%E2%80%932023.pdf (noting that about 50% of transmission investment is based on local utility criteria, without undergoing regional planning). Long-standing precedent and practice preclude the conclusion that the only circumstance in which load receives sufficient benefits to render some level of regional cost allocation appropriate is where a transmission project is *actually selected* in a regional process. To wit, large interstate transmission infrastructure was being built well before FERC mandated regional planning processes in Order No. 1000, and the lack of a regional transmission planning process was no impediment to utilities allocating the costs of that infrastructure to end customers. *See Midwest ISO Transmission Owners v.*

*FERC*, 373 F.3d 1361, 1368-69 (D.C. Cir. 2004) ("we evaluate compliance with this unremarkable principle by comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party.") (citing *KN Energy*, 968 F.2d at 1300-01).

Indeed, the only rational conclusion from the evidence is that the JTIQ Upgrades—however planned—provide at least some benefit to load. Regardless of the particular process used, the Federal Power Act requires that a customer's rates for transmission service be based on an analysis of which customers benefit, to what degree, and whether the costs they bear are commensurate with those benefits. *E.g.*, *Old Dominion*, 898 F.3d at 1255 (FERC must disperse the costs of a project amongst beneficiaries "when benefits of the project are diffuse"). Here, FERC entirely sidestepped those inquiries by erroneously concluding that only hypothetical generators would receive sufficient benefits to warrant cost allocation.

FERC also attempts to cherry-pick the history of the JTIQ to suggest that the final portfolio benefits generators so substantially, and benefits load so little, that any cost allocation to load would be irrelevant or improper. In the Rehearing Order, FERC noted that two projects initially proposed for the JTIQ portfolio were ultimately moved into the MTEP (*i.e.*, MISO's regional planning process). Reh'g Order P 48, R.166:39-40. FERC then drew the incongruous conclusion that the inclusion of these two projects in regional planning somehow proves that the remaining

JTIQ projects *did not* benefit load. That conclusion is unsound. As explained above, the fact that a project falls below a particular benefit-to-cost ratio does not, in and of itself, prove that load derives only "minor and incidental" benefits from that project. For example, a hypothetical $1 billion proposed project that provides load with $1.4 billion in benefits would fall short of a 1.25 benefit-to-cost ratio, but those $1.4 billion in benefits would be no less real if the project were planned via another process. Indeed, the very MISO presentation that FERC cited to, Reh'g Order P48, R.166:39 n. 202, concluded that benefits to load were reduced showed that, as of October 2023—a year and a half after the two projects moved to MTEP—end customers in MISO and SPP would save over $175 million on energy production costs over 20 years, MISO, *JTIQ Status Update – Planning Advisory Committee*, at 6 (2023), https://cdn.misoenergy.org/20231011%20PAC%20Item%2008a%20JTIQ%20Status%20Update630459.pdf. Adjusted production cost savings are only *one* of the six benefits that SPP lists, and that FERC notionally took stock of in its orders. Thus, the evidence FERC cited demonstrates that load benefits from the JTIQ Projects. And it shows that overall benefits decreased when some of the projects were removed from the JTIQ study. That is exactly what one would expect. Contrary to FERC's assertion, the fact that overall benefits decreased when some projects were removed in no way illustrates that the remaining projects do not benefit load. Con-

trary to FERC's assertion, the fact that two projects were transferred from JTIQ Portfolio #1 to MISO's regional transmission plan is clear evidence that the projects included in JTIQ Portfolio #1 are major transmission facilities of the type normally built to accommodate consumer demand for electricity rather than an individual generator's interconnection to the grid. By allocating the costs of those facilities to new generators rather than to end customers, without regard to the actual costs and benefits for either class of customer, FERC guaranteed that, under its application of the beneficiary-pays principle, the costs allocated to generators will be too high and the costs, if any, allocated to end customers will be too low. That result necessarily produces unjust, unreasonable, and unduly discriminatory rates, in violation of the Federal Power Act.

### B. FERC's Orders Are Arbitrary and Capricious Because They Reach Contradictory Conclusions Regarding Load's Relationship to the JTIQ Projects

FERC's strained reasoning regarding the purported lack of benefits to end customers forced FERC to draw contradictory conclusions regarding load's backstop funding role. Under the JTIQ framework, load provides backstop funding—either temporary or permanent—for JTIQ Upgrades. In the temporary backstop scenario, end customers would provide up-front funding for the construction of the JTIQ portfolio—but as generators show up to use the projects, the generators would be assigned a share of the costs, until the JTIQ projects are fully paid-for. In the

permanent backstop scenario, load would ultimately pay the unsubscribed cost of the JTIQ portfolio if either no generators show up or not enough show up to cover the full cost of the portfolio themselves. FERC's acceptance of the backstop funding proposal is a tacit recognition that end customers do, in fact, benefit from the JTIQ Upgrades—otherwise, the backstop funding mechanism necessarily would violate the beneficiary-pays principle. But FERC's stated rationale did not actually address the benefits to end customers or explain how adopting the backstop funding mechanism is consistent with FERC's conclusion that generators are the sole cause of the costs at issue.

At various points in both of its orders, FERC utilizes contradictory assumptions regarding whether and how costs will be allocated to end customers. On one hand, it assumed that the backstop funding mechanism is sufficient to ensure that costs are allocated to end customers roughly commensurate with benefits they will receive if not enough generators subscribe to the project. On the other hand, FERC expressed its confidence that sufficient generation will appear to fully fund the upgrades; if true, this would mean load is ultimately responsible for little to no cost. For example, in the Initial Order, FERC stated that "the backstop mechanism potentially presents an uncertain final cost to be paid by load[,]" but in the same paragraph asserted "[w]e agree with the RTOs that the significant need for interconnection capacity at the MISO-SPP seam means that JTIQ Portfolio #1 will likely eventually be

fully subscribed and, therefore, that load being allocated backstop costs on a permanent basis is unlikely." *See* Initial Order P 201, R.148:94. FERC cannot have it both ways. Either end customers benefit from the JTIQ Upgrades, in which case they must be allocated costs commensurate with those benefits, or they do not, in which case it would be unlawful to require them to provide backstop funding for the JTIQ Upgrades.

Petitioners raised this contradiction on rehearing, but FERC maintained its incongruity in the Rehearing Order. CEA Reh'g Req. 19-20. FERC claimed that any concerns about backstop funding by load on a permanent basis are "speculative because whether JTIQ Portfolio #1 will be fully subscribed is uncertain." Reh'g Order P 45, R.166:37. That response entirely misses the mark. First, there is nothing speculative about a scenario that is expressly contemplated by the framework that FERC approved. Second, and more to the point, FERC's obligation is to explain why the cost allocation framework it approved will produce lawful rates in the scenarios contemplated by that framework; it is not a protester's obligation to prove the negative (although in this case the Petitioners did so). If FERC believed that not enough generators would show up to pay for the JTIQ Upgrades, FERC should have attempted to quantify the extent of risk to load—and analyze whether the resulting costs would be commensurate with the benefits to load. Yet FERC did not do so.

Instead, FERC walked back its doubt over the subscription model by concluding it is all but certain that sufficient generators *will* show up to fund the JTIQ Upgrades—resulting in load being fully repaid, and bearing none of the long-term capital costs of the portfolio. *See, e.g.*, Rehearing Order at P 31 (claiming the JTIQ Study process establishes an "expectation of contribution" from interconnection customers). FERC claimed that "based on substantial evidence, including the JTIQ Study, the SPP CAWG Study, testimony, and economic theory" it could find "demand for interconnection service near the MISO-SPP seam, as evidenced by the unprecedented number of interconnection requests in the RTOs' respective interconnection queues" will result in full subscription to the JTIQ Portfolio. Reh'g Order, P32 and n.127. The only way FERC can sustain that incongruity is by characterizing the multiple benefits to load as "minor and incidental." That unsupported assertion is directly at odds with the record evidence and the relevant FERC and court precedent. The Court should reject FERC's tortured rationale.

### C. FERC's Approval of JTIQ Departs from Its Own Precedent on "Beneficiary Pays" without a Rational Explanation

FERC's decision to allocate all JTIQ costs to generators contradicts its prior recognition that beneficiaries, including load, must bear costs commensurate with the benefits received, and its failure to provide reasoned analysis for departing from its precedent violates the Administrative Procedure Act. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 57 ("[A]n agency changing its course must supply a reasoned

analysis.”). When changing position, the agency must “display awareness that it *is* changing position” and offer “good reasons for the new policy.” *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This Court applies this requirement strictly: “For the agency to reverse its position in the face of a precedent it has not persuasively distinguished is quintessentially arbitrary and capricious.” *La. Pub. Serv. Comm’n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999). When departing from precedent, “conclusory statements will not do; an ‘agency’s statement must be one of *reasoning*.’” *Amerijet Int’l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation omitted). FERC “must examine the relevant data and articulate a satisfactory explanation for its action” including a “rational connection between the facts found and the choice made.” *Id.* (quoting *El Paso*, 76 F.4th at 357).

Here, FERC failed to meet this standard. FERC failed to engage in reasoned decision-making in applying the beneficiary-pays principle by: (i) misinterpreting precedent; (ii) failing to explain how the JTIQ framework’s cost allocation proposal is consistent with policy and precedent; (iii) failing to respond to arguments and evidence; and (iv) accepting the proposed cost allocation proposal without support of substantial evidence in the record demonstrating that they are just, reasonable, and not unduly discriminatory.

As detailed above, FERC misapplied the beneficiary-pays principle by allocating 100 percent of $1.7 billion in JTIQ Portfolio #1 costs to hypothetical generators, despite acknowledging that load receives measurable benefits. *See* Initial Order P 198, R.148:92. As discussed, this result is directly at odds with FERC's practice of allocating costs commensurate with benefits. FERC's failure to provide a reasoned justification for this departure falls short of the agency's obligations under the Administrative Procedure Act. *See Fox Television*, 556 U.S. at 515.

FERC failed to explain how its JTIQ cost allocation is consistent with FERC policy or precedent. FERC merely concluded, without evidence or explanation, that the benefits to load are "minor and incidental" and that the JTIQ upgrades "do not provide sufficient benefits for load … to qualify as transmission projects selected in the regional transmission plan." Reh'g Order PP 17, 31, R.166:12, 24. As explained above, that conclusion is irrational because the question of whether a project is beneficial does not turn on whether it was included in a regional planning process. More to the point, the fact that a particular project is not included in a regional plan does not excuse FERC from conducting the necessary benefits inquiry to determine whether the costs of that project are allocated in the manner required by the Federal Power Act. JTIQ Upgrades, like other transmission projects—including locally planned projects—can have significant benefits to load even if they are not selected

in a regional transmission planning process (*i.e.*, even if they are not the more efficient or cost-effective project when compared to other options) or if they are never presented in that planning process. The record clearly shows that to be the case for JTIQ Portfolio #1. By using selection in a regional planning process as a proxy for benefits, FERC erroneously adopted a new standard for allocating costs without acknowledging that it was departing from its established beneficiary-pays framework. Because FERC did not "display awareness that it *[wa]s* changing position" and provide "good reasons for the new policy," FERC's action is unlawful. *Fox Television*, 556 U.S. at 515.

## III. FERC Failed to Show Generators Are the Cause of the JTIQ Upgrades

In the agency proceeding, Petitioners also challenged FERC's application of cost-causation principle, explaining that because the beneficiary-pays principle is an extension of the cost-causation principle, FERC can analyze cost causation without applying the beneficiary-pays principle but cannot apply the beneficiary-pays principle in lieu of analyzing causation. While FERC agreed that the beneficiary-pays principle is an extension of the cost-causation principle, it erroneously concluded that, under the beneficiary-pays principle, it need not determine causation to allocate 100 percent of JTIQ costs to one class of customers. *See* Reh'g Order PP 26-28, R.166:19-21. In FERC's view, as long as a customer benefits from a transmission facility it can be said to have caused the costs associated with that facility. *Id.* P 26

(citing *Illinois Commerce Commission*, 576 F.3d at 476). That conclusion fails as a matter of both logic and law.

Regardless of whether the cost-causation principle and beneficiary-pays principle must be analyzed separately or can, as FERC asserted, be collapsed together, FERC failed to explain how new generators that are identified *after* a JTIQ portfolio is fully baked—and possibly even after the JTIQ Upgrades are constructed, in service, and paid for by load through backstop funding—can be considered the *sole* cause of those costs. What's worse, in terms of cause and effect, FERC's rationale allows for an effect that has *no* cause. Here, the effect is the transmission facilities, and the purported cause is the new generators. But FERC applies its reasoning to generators that do not exist when the transmission facilities are identified or, perhaps, fully constructed—*and even if no such generators ever come into existence*. To state the obvious, if no generators exist to bear the cost of JTIQ Upgrades, then the effect would be left without a cause.

Nor is there any support for the proposition that generators could be the *sole* cause of the transmission facilities and their costs. As noted, end customers' demand for electricity is the linchpin of the industry. In the absence of end customer demand for electricity, there would be no need for generation resources to supply electrons or for a transmission system to deliver that supply. In that way, end customers are the legally relevant cause of the transmission system. At the very least, they are *a*

legally relevant cause. It is, thus, no surprise that with the exception of facilities that are identified as needed for a specific generation resource seeking to interconnect with the transmission system—a relatively small portion of that system—the costs of the nation's transmission system are generally allocated to end customers. But in this case, FERC's orders entirely invert that economic relationship, assuming without evidence or rational explanation that new generators are the only legally relevant cause of new transmission infrastructure along the MISO-SPP seam. There are several problems with FERC's novel theory.

First, FERC's stated rationale does not hold up to scrutiny. FERC argued that the as-yet unidentified generators are the cause of the JTIQ Upgrades because the JTIQ Study that identified those upgrades "established the 'expectation of contribution' (from the interconnection customers)." *See* Reh'g Order P 31, R.166:23. But that reasoning runs headlong into all of the flaws in FERC's causal reasoning discussed above. Moreover, FERC utterly failed to explain how such an "expectation" that a future generator will pay for a particular transmission facility means that generator caused the facility to be constructed.

FERC's theory appears to be "if you build it, [they] will come."[3] That is, the mere fact that a transmission facility is built in an area is enough to guarantee that a

[3] FIELD OF DREAMS, Blu-ray (Gordon Company 1989).

generator will come pay for it. There are two fatal flaws in that logic. First, a transmission facility without end customers attached to it is useless for a generator; generators respond to customer demand for electrons, not the mere presence of a wire. Second, to the extent there is a causal relationship in FERC's conception, it is the transmission facility that causes the generator to come into existence in that location (as opposed to some other location), rather than the generator that causes the transmission facility.

Second, FERC provided no limiting principle on its theory of causation. The transmission facilities in JTIQ Portfolio #1 are major transmission infrastructure projects. As indicated by the fact that the portfolio originally included two additional projects that were transferred into MISO's regional transmission plan, the JTIQ framework is intended to fund the construction of large-scale additions to the power grid. By FERC's rationale, future generators could be considered the legally relevant cause of much of the nation's transmission system, while end customers would be treated as passive bystanders who neither cause the need for, or benefit from, upgrades to the power grid. That is both inconsistent with foundational economic principles of the industry and contrary to decades of FERC and court precedent.

Third, everywhere else in the country other than the MISO-SPP seam, cost allocation rules remain generally based on the assumption that end customers, not new generators, are the legally relevant cause of all transmission infrastructure that

is not directly caused by a specific generator, based on its specific interconnection request, and identified in its fact-specific interconnection study. Flipping the industry's basic economic relationship between demand and supply on its head in one geographic area and exposing new generators in that area to a fundamentally different and more onerous cost allocation framework is a textbook example of the type of undue discrimination the Federal Power Act prohibits.

Instead, FERC articulated a new standard that is a departure from precedent: generators are the *primary beneficiaries* of the proposed JTIQ Upgrades. *See* Initial Order P 196, R.148:91; *accord* Reh'g Order P 24, R.166:17. FERC offered no explanation for its departure.

As discussed herein, it is clear—from the stakeholder process through which the JTIQ cost allocation approach was developed, from the JTIQ study itself, from statements and evidence in the record, and from historical observation—that there are multiple drivers of the need for transmission upgrades at the MISO-SPP seam. Yet in this proceeding, FERC ignored all other cost causers, announced that interconnection customers are the "primary beneficiaries" of the JTIQ Upgrades, and, based on that general declaration, blessed the allocation of all costs to generators. *Id.*

Rather than recognize the role load plays in cost causation, FERC concluded that the JTIQ portfolio was developed "to address transmission system limitations preventing interconnection of large amounts of future generation capacity." Initial

Order P 198, R.148:92. This circular reasoning does not withstand scrutiny. As explained above, FERC inverted its own long-accepted economic theory of the industry by asserting that supply (*i.e.*, generation) is actually "demand"—but only for purposes of JTIQ. The fact that a central goal of the JTIQ study was to address interconnection constraints does not obviate load's contributions to the need for the solutions that the JTIQ identified. Indeed, both MISO and SPP pointed to anticipated benefits to load at the initiation of the JTIQ study[4] and upon its completion,[5] which directly conflicts with FERC's characterization of the JTIQ study as being singularly focused on the needs of interconnection customers. Accordingly, FERC erred by ignoring the causal role of load and finding that future generators are the sole cause of JTIQ Upgrades and are agnostic when it comes to customer demand for electricity.

[4] Right from the start, in their joint press release announcing the JTIQ study, MISO and SPP stated, "This joint study will focus on solutions that the RTOs believe will offer benefits to both their interconnection customers and end use consumers of RTO member companies." Press Release, *MISO, SPP, MISO and SPP to conduct joint study targeting interconnection challenges* (Sep. 14, 2020), https://web.archive.org/web/20250427105619/https://www.spp.org/news-list/miso-and-spp-to-conduct-joint-study-targeting-interconnection-challenges/.

[5] MISO and SPP, *Joint Targeted Interconnection Queue Study: Executive Summary and Technical Report*, at 2 (2022), https://cdn.misoenergy.org/JTIQ%20Report623262.pdf.

As FERC admitted, the JTIQ framework is a novel approach; it does not clearly fit neatly into the existing regional transmission planning or generator interconnection frameworks (even if it more closely resembles regional planning). JTIQ rolls up large, high-voltage transmission upgrades spanning two regions, and these lines are planned, and may be built, before any projects that would benefit from them are known. There is no evaluation of whether a particular line is necessary to serve a particular generator or generators. *See* CEA Reh'g Req. 11, R.153:11. But the mere fact that a proposal is novel is not an excuse to inexplicably depart from established precedent. If FERC believes this approach cannot fit squarely within its decades of precedent, *see* Reh'g Order P 34, R.166:26-28, then it must explain its departure. In failing to do so, FERC violated the Administrative Procedure Act and approved a framework that is patently inconsistent with the cost-causation and beneficiary-pays principles that constitute the bedrock of cost allocation under the FPA.

## CONCLUSION

For the foregoing reasons, this Court should vacate FERC's orders.

Respectfully submitted,

/s/ *Nicholas M. Gladd*
NICHOLAS M. GLADD
*Counsel of Record*
KELSEY C. CATINA
STEVEN BOUGHTON
*Wilson Sonsini*
*Goodrich & Rosati, P.C.*
*1700 K Street, N.W.*
*Washington, DC 20006*
*(202) 973-8000*
*ngladd@wsgr.com*

*Counsel for Advanced Energy United, Advanced Power Alliance, American Clean Power Association, Clean Grid Alliance, and Solar Energy Industries Association*

GABRIEL TABAK
*Assistant General Counsel*
*American Clean Power Association*
*1299 Pennsylvania Ave, N.W.*
*13th Floor*
*Washington, D.C. 20005*
*(202) 383-2500*
*gtabak@cleanpower.org*

*Counsel for American Clean Power Association*

MELISSA ALFANO
*Senior Director of Energy Markets and Counsel*
*Solar Energy Industries Association*
*1425 K Street, N.W.*
*Ste. 1000*
*Washington, DC 20005*
*(202) 566-2873*
*malfano@seia.org*

*Counsel for Solar Energy Industries Association*

DATED: OCTOBER 17, 2025

**CERTIFICATE OF SERVICE**

I certify that on October 17, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the Court's CM/ECF system. A copy of the foregoing was served on all counsel of record via CM/ECF in compliance with Fed. R. App. P. 25(b) and (c).

Dated: October 17, 2025

By: *<u>/s/ Nicholas M. Gladd</u>*
Nicholas M. Gladd
*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limits of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,595 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

Dated: October 17, 2025

By: */s/ Nicholas M. Gladd*
Nicholas M. Gladd
*Counsel for Petitioners*